N THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:              )

                     )   Chapter 11

                     )

COMBUSTION ENGINEERING, INC.,   )   Case No. 03-10495-JKF

                     )

      Debtor.           )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF COMBUSTION ENGINEERING, INC.'S PLAN OF REORGANIZATION, AS MODIFIED THROUGH OCTOBER 7, 2005

This matter comes before the Court upon the request of Combustion Engineering, Inc.,

debtor and debtor in possession (the "Debtor" or "CE"), for an order confirming the Debtor's

proposed Plan of Reorganization, as Modified Through October 7, 2005 and filed of record on

October 7, 2005 (hereinafter, the "Modified Plan").[1]

The Court has reviewed the briefs in support of and opposition to confirmation of the

Modified Plan, together with the supporting materials filed by all interested parties, and has

considered the oral arguments of all interested counsel and the testimony of witnesses and other

evidence admitted at the Confirmation Hearing held on September 28, 2005.

The Court has also reviewed the affidavit of Cassandra Murray of BSI Services, LLC,

dated September 23, 2005 (Docketet No. 2543), with respect to service of the notice of the

Confirmation Hearing, and the affidavit of Anne Nichols dated August 28, 2005, confirming the

publication of notice of the Confirmation Hearing in The Wall Street Journal (National Edition)

on August 25, 2005, all in accordance with the Order (A) Approving Adequacy Of Debtor's

Modified Disclosure Statement; (B) Approving Form Of Ballots, Voting Deadline, And

Resolicitation Procedures; (C) Approving Form And Manner Of Notices; And (D) Approving

---

[1]     Capitalized terms used herein shall have the meanings ascribed to them in the Glossary filed of record on October 14, 2005 unless otherwise indicated. Any capitalized term used but not defined herein, or in the Glossary, but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules.

The Form Of Letters In Support Of The Plan (the "Scheduling Order"),[2] and concludes that good and sufficient notice of the Confirmation Hearing was given to all parties in interest.

The Court admitted into evidence the affidavits and declarations filed in support of the confirmation of the Modified Plan as if the makers thereof gave live testimony and, to the extent that such affidavits and declarations contain expert testimony, the Court hereby finds that the signatories to such affidavits and declarations are qualified as expert witnesses, the Court accepts their testimony and opinions as expert testimony and opinions under the Federal Rules of Evidence, and the expert affidavits and declarations are admitted as such.[3]

After due deliberation and sufficient cause appearing therefor, the Court hereby makes the following findings of fact and conclusions of law (the "Findings and Conclusions").[4]

## INTRODUCTION

1.      This matter comes before the Court following the United States Court of Appeals for the Third Circuit (the "Third Circuit") vacating and remanding this Court's confirmation order confirming the Debtor's original pre-packaged plan of reorganization (the "Pre-Packaged Plan").[5]  Specifically, the Third Circuit found that (I) there were insufficient factual findings to support "related-to" jurisdiction over the non-derivative claims of Lummis and Basic; (ii) that neither section 105 nor 524(g) permitted the extension of the channeling injunction to non-

---

[2]      Hrg. Ex. 236 (each Hrg. Ex. referenced herein refers to the Plan Proponents' exhibit list).

[3]      9/28/05 Hrg. Tr. ("Confirm. Hrg. Tr.") at 80-83.

[4]      These Findings and Conclusions constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014. Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact. Citations to the Bankruptcy Code and Rules are to the sections and rules as numbered and in effect prior to October 17, 2005.

[5]      Notably, all objections to the Modified Plan were resolved or withdrawn prior to confirmation, including any objections raised by certain insurance companies of the Debtor which were withdrawn following the Debtor's agreement to revise the "super-preemptory provision" effectively to conform to the super-preemptory provision found in the Third Circuit Opinion. *See* Confirm. Hrg. Tr. at 75-76. Thus, the Modified Plan is before this Court without objection.

derivative claims; and (iii) remand was necessary to determine whether current and future

asbestos personal injury claimants received fair treatment in light of the pre-petition payments

made to the Participating Claimants.[6] For the reasons set forth throughout these Findings and

Conclusions, the Modified Plan addresses all of these issues.

    2.    First. The Modified Plan no longer addresses the non-derivative asbestos

personal injury claims of Lummus and Basic.[7] The definition of CE Asbestos PI Trust Claims

has been revised to make clear that claims against Lummus and Basic which are not derivative

of CE's direct liability are no longer included, and such claims are not channeled to the Asbestos

PI Trust.[8]

    3.    Second. All references to section 105 in the Modified Plan are deleted from the

Findings of Fact and Conclusions of Law by this Court. The parties asserted that section 105

merely provides an alternative ground for the injunctive relief, which is co-extensive with the

Court's primary authority under section 524(g). Thus, section 105 is not a necessary predicate to

confirmation of this Modified Plan. The Court notes that in the Modified Plan, section 105 was

not used to enjoin the non-derivative claims of Lummus and Basic because those claims have

been expressly excluded from the scope of the Modified Plan and Channeling Injunction.[9]

    4.    Third. As set forth more fully below, the additional consideration and the terms

of the Modified Plan itself provide for parity, under the particular circumstances of this case,

among the Participating Claimants who received payments from the CE Settlement Trust and

Asbestos PI Trust Claimants.[10] Specifically, the Asbestos PI Trust is entitled to receive an

---

[6]    *See generally In re Combustion Eng'g, Inc.*, 391 F.3d 190, 230-47 (ed Cir. 2004); *see also* discussion *infra* ¶ 48, at 19-20.

[7]    *See* discussion *infra* ¶¶ 45-46, at 18, and ¶ 49, at 20. *See also* Brett Aff. at 16.

[8]    *See* discussion *infra* ¶¶ 45-46, at 18. *See also* Brett Aff. at 16, Hrg. Ex. 7; Modified Plan § 7.15.4, Hrg. Ex. 2.

[9]    *See* discussion *infra* ¶¶ 45-46, at 18. *See also* Confirm. Hrg. Tr. at 52; Brett Aff. at 16, Hrg. Ex. 7; Modified Plan § 7.15.4, Hrg. Ex. 2.

[10]    *See* discussion *infra* ¶¶ 50-55, at 21-23 and ¶ 87, at 32; Confirm. Hrg. Tr. at 49-52.

3

additional contribution from ABB and the CE Settlement Trust of no less than $206 million.[11] In addition, the Participating Claimants who received payments from the CE Settlement Trust or are Category 4 Claimants will not, under the Modified Plan, be entitled to receive any distributions from the Asbestos PI Trust established under the Modified Plan.[12] These changes, among others, allow Class 5 Claimants and future claimants to receive distributions of approximately 48.33% of their claims, while Participating Claimants who received distributions from the CE Settlement Trust have received, on average, 45.5% of their claims.[13] Under the particular circumstances of this case, this satisfies the Third Circuit's concern as to parity between the Participating Claimants who received distributions from the CE Settlement Trust and current and future Asbestos PI Trust Claimants who will receive distributions from the Asbestos PI Trust. Further, the Modified Plan and Disclosure Statement clearly alerted the Participating Claimants under the CE Settlement Trust that they would not receive further distributions from the Asbestos PI Trust. Their votes, therefore, do not, impermissibly or otherwise, skew the overwhelming support for the Modified Plan, nor do their "stub claims" artificially impair any class.

5.      Based upon the foregoing and for the reasons et forth below, this Court finds and concludes that confirmation of the Modified Plan is appropriate.

---

[11]     *See* discussion *infra* ¶ 44, at 16-17; Confirm. Hrg. Tr. at 49-50; Brett Aff. at 12-15, Hrg. Ex. 7.
[12]     *See* discussion *infra* ¶ 44, at 16-17; Confirm. Hrg. Tr. at 50-51; Modified Plan § 3.2.6.2, Hrg. Ex. 2; Disclosure Statement at 8-9, 42-43, Hrg. Ex. 1; Brett Aff. at 12, Hrg. Ex. 7.
[13]     *See* discussion *infra* ¶ 87, at 32; Confirm. Hrg. Tr. at 49; Bhagavatula Aff. at 5, Hrg. Ex. 11; Dickhoff Aff. at 3, Hrg. Ex. 9.

## FINDINGS AND CONCLUSIONS

### Jurisdiction and Venue

6.     The Court has jurisdiction to conduct the Confirmation Hearing and to confirm the Modified Plan pursuant to 28 U.S.C. §§ 157 and 1334.  Plan confirmation is a core proceeding pursuant to 28 U.S.C. § 157(b), and this Court has jurisdiction to enter an order with respect thereto.  However, certain aspects regarding entry of a § 524(g) injunction require approval of the District Court.

7.     In connection with the Confirmation Hearing, the Court has jurisdiction under 28 U.S.C. § 157(b)(2)(B), (L), and (O), 11 U.S.C. § 502(c) and Bankruptcy Rule 3018(a) to estimate the value of certain claims for purposes of voting, confirm the Modified Plan, and enter the Channeling Injunction and the Asbestos Insurance Entity Injunction contemplated by the Modified Plan.  Because of the unique nature of the difficulty in ascertaining on an issue by issue basis whether the Bankruptcy Court's jurisdiction is core or non-core, the Bankruptcy Court will recommend to the District Court entry of a final Order of Confirmation.

8.     The Debtor was and is qualified to be a debtor under section 109(a) of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended (the "Bankruptcy Code"), and the Debtor is a proper proponent of the Modified Plan under section 1121(a) of the Bankruptcy Code.  CE is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Norwalk, Connecticut.  Accordingly, venue in Delaware was proper as of the Petition Date pursuant to 28 U.S.C. § 1408 and continues to be proper.

9.     Each of the conditions precedent to confirmation of the Modified Plan and entry of the Confirmation Order has been satisfied in accordance with section 7.10 of the Modified Plan.

**Review of Record**

10.    This Court has considered the 2003 and 2005 Plan proceedings, including review of all of the filings, orders and evidence entered in those proceedings.[14]

**Technical Modifications to the Modified Plan**

11.    The Debtor filed the First Technical Modifications to the Modified Plan on September 22, 2005, the Second Technical Modifications to the Modified Plan on September 27, 2005, the Third Technical Modifications to the Modified Plan on October 7, 2005, a Fourth Technical Modification to the Modified Plan on October 12, 2005, and the Fifth Technical Modifications to the Modified Plan on October 14, 2005 (collectively, the "Technical Modifications"). The court has entered Orders approving all of the technical modifications.

12.    The Technical Modifications do not materially alter or adversely affect the treatment of any Claim against or Equity Interest in the Debtor. Pursuant to section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, the Technical Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims against or Equity Interests in the Debtor be afforded the opportunity to change previously cast ballots accepting or rejecting the Modified Plan as filed with the Bankruptcy Court.

13.    Accordingly, the Modified Plan, as modified by the Technical Modifications, is properly before this Court and all votes cast with respect to the Modified Plan, prior to the

---

[14]    Confirm. Hrg. Tr. at 79-80, 82-83.

Technical Modifications, shall be binding and shall be deemed cast with respect to the Modified Plan as modified by the Technical Modifications.

## FINDINGS OF FACT

### Procedural Background

14.     CE filed a voluntary petition for relief under the Bankruptcy Code on February 17, 2003 (the "Petition Date").[15]  Concurrently therewith, the Debtor also filed its pre-packaged plan of reorganization (the "Pre-Packaged Plan")[16] and disclosure statement (the "Original Disclosure Statement").[17]

15.     On or about March 11, 2003, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in the Chapter 11 Case pursuant to section 1102(a)(1) of the Bankruptcy Code (the "Unsecured Creditors' Committee").

16.     By order dated March 17, 2003, the Bankruptcy Court entered an order appointing David Austern as the legal representative for future asbestos claimants (the "Future Claimants' Representative" or "FCR"), nunc pro tunc to the Petition Date.

17.     On April 24, 2003, the Bankruptcy Court commenced a combined hearing to determine the adequacy of information contained in the Original Disclosure Statement and whether to confirm the Pre-Packaged Plan (the "Original Confirmation Hearing"), which ultimately concluded on June 3, 2003.

18.     Following the Original Confirmation Hearing, the Bankruptcy Court entered (a) the June 23 Findings and Conclusions, (b) an Order Approving the Disclosure Statement but Recommending Withholding of Confirmation of the Plan of Reorganization for Combustion

---

[15]     Hrg. Ex. 191.
[16]     Hrg. Ex. 44.
[17]     Id.

Engineering for Ten Days dated June 23, 2003;[18] and (c) the July 10 Findings and Order

(collectively, the "Original Confirmation Order"). Thereafter, the United States District Court

for the District of Delaware (the "District Court") entered a Revised Confirmation Order on

August 8, 2003,[19] affirming the Bankruptcy Court's Original Confirmation Order (collectively,

the "Confirmation Order").

19. On appeal, the United States Court of Appeals for the Third Circuit (the "Third

Circuit") in December 2004, vacated the Confirmation Order and remanded for further

proceedings.[20] The Third Circuit principally focused on three issues raised by appellants that

related to the terms of the Pre-Packaged Plan: (1) whether the Court had "related-to" jurisdiction

over the non-derivative claims against the non-debtor affiliates, Lummus and Basic; (2) whether

Lummus and Basic could avail themselves of the protection of a channeling injunction by

invoking section 105 of the Bankruptcy Code; and (3) whether the two-trust structure of the Pre-

Packaged Plan complied with the Bankruptcy Code by allegedly providing disparate treatment

between the asbestos claimants who participated in the Master Settlement Agreement or an

Adoption Agreement (the "MSA") ("the stub claims") and those claimants who did not. The

Third Circuit also addressed certain issues involving (a) the interests of companies that have

provided liability insurance to the Debtor and its affiliates including, without limitation (i)

provisions of the Confirmation Order providing for insurance neutrality, and (ii) the standing of

such insurers to participate in the appeal of the Confirmation Order; and (b) whether claimants

with only "stub claims" would artificially impair the class of asbestos claims by their inclusion

with non-settling claimholders.

---

[18] Hrg. Ex. 209.

[19] Hrg. Ex. 213.

[20] *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 248-49 (3d Cir. 2004).

8

**Historical Asbestos Claims Against CE**

20.    CE was first named as a defendant in an asbestos case in the mid-1960's. By the mid-1970's, CE was receiving a few hundred asbestos claims per year. Asbestos claims had been known and disclosed by CE in its financial statements in the mid-1980's, but did not begin to have a material effect on CE's financial health until the mid-1990s.[21]

21.    Since 1989, over 409,000 asbestos-related claims have been filed against CE.[22] CE's claims rapidly increased in the several years prior to the Petition Date. In 2001, approximately 55,000 asbestos claims were filed against CE, compared to 39,000 in 2000. In 2002, approximately 79,000 asbestos-related personal injury claims were filed against CE, and approximately 138,000 such claims were pending.[23]

22.    In the Fall of 2002, as a consequence of a significant increase in the level of new asbestos claims, increased total and per-claim settlement costs of such claims, and the depletion of primary insurance coverage, CE determined to resolve its asbestos-related liabilities and that of its Affiliates by reorganizing under Chapter 11 of the Bankruptcy Code.[24]

---

[21]    9/12/05 Brett Aff. ¶ 5, Hrg. Ex. 7; Disclosure Statement at 13, Hrg. Ex. 1.
[22]    Disclosure Statement at 13, Hrg. Ex. 1; 9/12/05 Brett Aff. ¶7. Hrg. Ex. 7.
[23]    Disclosure Statement at 13, Hrg. Ex. 1; 9/12/05 Brett Aff. ¶7. Hrg. Ex. 7.
[24]    9/12/05 Brett Aff. ¶ 8, Hrg. Ex. 7.

**Pre-Pack Structure that Drove the Negotiations**

23.    The need for the Pre-Packaged Plan arose as a direct consequence of the ever increasing number of new asbestos claims filed against CE, and the rising total and per-claim settlement costs of such claims.[25]  The rising claims, along with a decline in available insurance proceeds, left CE unable to pay its asbestos claims without significant contributions from its parent Asea Brown Boveri (now ABB Holdings).[26]

24.    At the same time, ABB was experiencing a severe financial crisis due, in part, to the asbestos liabilities of CE, as well as another ABB subsidiary, Lummus.[27]  One of the main tenets of ABB's divestment and restructuring plan at the time involved a sale of Lummus, which sale could not occur unless and until Lummus' asbestos liabilities were fully and finally resolved.[28]

25.    Thus, ABB and CE set out to negotiate a resolution of CE's and Lummus' asbestos claims with counsel for a majority of the holders of CE's asbestos claims, as well as the soon-to-be appointed FCR.[29]

---

[25]    June 23 Findings and Conclusions at 5, Hrg. Ex. 210.
[26]    June 23 Findings and Conclusions at 5, Hrg. Ex. 210.
[27]    June 23 Findings and Conclusions at 6, Hrg. Ex. 210.
[28]    June 23 Findings and Conclusions at 7, Hrg. Ex. 210.
[29]    June 23 Findings and Conclusions at 9, Hrg. Ex. 210.

**The Master Settlement Agreement**

26.     The result of such negotiations was a Memorandum of Agreement regarding the basic structure of the Pre-Packaged Plan and CE's entry into a Master Settlement Agreement (the "MSA")[30] that settled almost all of CE's open asbestos-related personal injury claims that had been commenced in either a judicial or administrative proceeding against CE prior to November 15, 2002.[31]

27.     Pursuant to the MSA, CE agreed to form and fund the CE Settlement Trust to administer and pay asbestos personal injury claims settled under the MSA.[32]  Initially, the MSA allocated funds among three categories of claimants.[33]  Once a claimant met the qualifying criteria set forth in the CE Settlement Trust Documents, he or she was entitled to be paid a percentage of his or her claim from the CE Settlement Trust.[34]  Specifically, Category 1 claimants were entitled to 95% of their claims; Category 2 claimants were entitled to 85% of their claims; and Category 3 claimants were entitled to 37.5% of their claims.[35]  A fourth category of claimants was subsequently created by amendment to the MSA to address the dispute of certain Category 3 Claimants.  The newly created Category 4 Claimants were entitled to share in an additional $30 million contributed by ABB to a segregated fund within the CE Settlement Trust.[36]

28.     The MSA claimants for the most part received partial payment on their claims and they retained a claim against CE (a "Stub Claim") under the Pre-Packaged Plan that would have been channeled to the Asbestos PI Trust for liquidation and payment.  To date,

---

[30]     Hrg. Ex. 54.
[31]     June 23 Findings and Conclusions at 10-12, Hrg. Ex. 210.
[32]     June 23 Findings and Conclusions at 14, Hrg. Ex. 210.
[33]     June 23 Findings and Conclusions at 12-13, Hrg. Ex. 210; MSA §4.2, at 7-10, Hrg. Ex. 54.
[34]     June 23 Findings and Conclusions at 12, Hrg. Ex. 210; 9/12/05 Brett. Aff. at 4, Hrg. Ex. 7.
[35]     9/12/05 Brett Aff. at 4, Hrg. Ex. 7; MSA §5.1, at 11-13, Hrg. Ex. 54.
[36]     9/12/05 Brett Aff. at 4, Hrg. Ex. 7.

approximately 172,000 asbestos personal injury claimants were entitled to participate in the MSA (the "Participating Claimants") and approximately 154,000 received partial payment from the CE Settlement Trust.[37]

29.    Under the MSA, the CE Settlement Trust was funded by: (1) cash contributions from CE in the amount of $5 million; (2) a promissory note from CE in the principal amount of approximately $100 million (the "CE Note"); (3) an assignment by CE of a loan agreement between Asea Brown Boveri, as borrower, and CE, as lender, under which Asea Brown Boveri agreed to pay $402 million upon demand by CE (the "Asea Brown Boveri Loan"); and (4) a guaranty by ABB of the CE Note and the Asea Brown Boveri Loan.[38]

30.    Following the execution of the MSA, the CE Settlement Trust made distributions of over $434 million to approximately 154,000 Participating Claimants, thereby allowing such claimants to receive an average recovery of 45.5% of their asbestos claims submitted under the MSA.[39]  As of the present date, the CE Settlement Trust holds approximately $15.7 million of the original contributions and approximately 17,000 pending claims remain unpaid, some of which will not qualify for payment under the CE Settlement Trust Documents and some of which will not be paid if the CE Settlement funds are exhausted.[40]

## Summary of the Pre-Packaged Plan

31.    Following extensive due diligence performed by the FCR and his representatives, the Pre-Packaged Plan was finalized.[41]  On or about January 19, 2003, CE commenced solicitation of votes on its Pre-Packaged Plan. On February 17, 2003, CE filed its Chapter 11

---

[37]    Dickhoff Aff. at 3, Hrg. Ex. 9.; Brett Aff. at 4-5, Hrg. Ex. 7.
[38]    June 23 Findings and Conclusions at 13-14, Hrg. Ex. 210.
[39]    Dickhoff Aff. at 3, Hrg. Ex. 9.
[40]    Dickhoff Aff. at 3, Hrg. Ex. 9; Brett Aff. at 5, Hrg. Ex. 7.
[41]    June 23 Findings and Conclusions at 18-20, Hrg. Ex. 210.

12

Case and shortly thereafter moved for approval of the Original Disclosure Statement and Pre-Packaged Plan.

32.     The central pillars of the Pre-Packaged Plan were (i) the creation of an asbestos trust to which all of the asbestos claims of CE and two other ABB subsidiaries, Lummus and Basic, would be channeled for resolution and payment; and (ii) entry of permanent channeling injunctions that would enjoin future prosecution of such claims against certain asbestos protected parties and settling asbestos insurance companies.[42]

33.     The Pre-Packaged Plan, as confirmed by the Bankruptcy Court and District Court, provided for the funding of the Asbestos PI Trust with:

- a $20 million 5% term note (the "CE Convertible Note") with a maximum term of ten years from the effective date of the Pre-Packaged Plan, to be issued by CE and secured by its real estate and real estate leases (under certain specified contingencies, the Asbestos PI Trust would have the right to convert the note into ownership of 80% of the voting securities of the Reorganized Debtor);

- excess cash held by CE on the Effective Date ("Excess Cash");

- the ABB Promissory Note, issued by Asea Brown Boveri and ABB, and guaranteed by certain ABB subsidiaries, in an aggregate amount of up to $350 million payable in installments;

- a non-interest bearing promissory note to be issued on behalf of Lummus in the amount of $28 million payable in relatively equal annual installments over 12 years;

- a non-interest bearing promissory note to be issued on behalf of Basic (the "Basic Note") in the amount of $9.72 million payable in relatively equal annual installments over 12 years;

- 30,298,913 shares of ABB (the "CE Settlement Shares"), which had a fair market value of $170 million, $154 million and $86 million at December 31, 2004, 2003, and 2002, respectively;

- an agreement that if Lummus were sold within 18 months following the Effective Date of the Pre-Packaged Plan, Asea Brown Boveri would contribute an additional $5 million to the CE Settlement Trust and $5 million

---

[42]     Brett Aff. at 5, Hrg. Ex. 7.

to the Asbestos PI Trust, and if the CE Settlement Trust ceased to exist at the time of payment, then the full $10 million would go to the Asbestos PI Trust; and

- an assignment by CE, Lummus, and Basic to the Asbestos PI Trust of any rights to proceeds under certain insurance policies. In addition, CE would assign to the Asbestos PI Trust scheduled payments under certain of its insurance settlement agreements (collectively with the proceeds from policies, "Certain Insurance Amounts").[43]

34.     The Pre-Packaged Plan as confirmed also contained several enhancements following negotiations with various constituencies, including the Unsecured Creditors' Committee and the FCR. These enhancements included:

- an agreement that Asea Brown Boveri would indemnify the CE estate against up to $5 million of liability on account of certain claims held by alleged indemnified insurers;

- limited jurisdiction over ABB to enforce ABB's financial obligations in the event of a default;

- an agreement that the asbestos channeling injunction would "fall away" if there was a financial default by any party obligated to make a contribution to the Asbestos PI Trust; and

- an agreement by Asea Brown Boveri to indemnify CE for certain nuclear and environmental obligations arising out of the Connecticut Site.[44]

35.     Finally, in response to certain objections raised by certain objecting insurers (the "Objecting Insurers"), the Pre-Packaged Plan contained a "super-preemptory provision," which made clear that nothing in the Pre-Packaged Plan impaired the rights of the Objecting Insurers.[45]

**The Trinchese Complaint**

36.     Within days following the Petition Date, an action was commenced against the CE Settlement Trustee and the holders of Settlement Trust Claims who received distributions from the CE Settlement Trust under the terms of the MSA by certain claimants with alleged

---

[43]     June 23 Findings and Conclusions at 28-30, Hrg. Ex. 210; Brett Aff. at 5-6, Hrg. Ex. 7.
[44]     June 23 Findings and Conclusions at 22-24, Hrg. Ex. 210.
[45]     See Combustion Eng'g, 391 F.3d at 209.

asbestos-related medical conditions (the "CCC") who had not participated in the MSA (the "Trinchese Complaint").[46] Among other things, the Trinchese Complaint sought to enjoin further distributions by the CE Settlement Trust and recover all distributions that had been made by the CE Settlement Trust as avoidable preferences and fraudulent conveyances.[47]

37.     On January 27, 2005, this Court authorized the FCR to join in the Trinchese Complaint as a party-plaintiff. This action is currently stayed and no decision has been rendered by the Court.[48] confirmation of the pending plan will moot the Trinchese Adversary, which will be dismissed with prejudice on (or shortly after) the Effective Date.

## The Modified Plan

38.     Following the Third Circuit Opinion, CE and the other proponents of the Pre-Packaged Plan began negotiations with the CCC in an attempt to resolve the objections raised by the CCC within the framework that the Third Circuit laid out in its opinion.[49] These negotiations lasted for months and involved the principals of ABB, CE, the Unsecured Creditors' Committee, the CCC, and the FCR, as well as representatives of other individual asbestos claimants.[50] In March 2005, the parties agreed to certain overall modifications to the Pre-Packaged Plan (the "Agreement in Principle").[51]

39.     The main features included in the Agreement in Principle, which are incorporated in the Modified Plan now before the court for confirmation, are: (i) an additional contribution of $204 million to the Asbestos PI Trust by ABB that is tied to the timing of a sale of Lummus; (ii) the payment by ABB of the legal fees of the CCC in the amount of $8 million; (iii) the

---

[46]     See *Trinchese v. Combustion Engineering, Inc., et al.*, Ch. 11 Case No. 03-10495, Adv. No. 03-50995 (Bankr. D. Del. 2003)

[47]     Brett Aff. at 8, Hrg. Ex.7; Disclosure Statement at 33-34, Hrg. Ex. 1.

[48]     Order Appointing Rep. to Pursue Avoidance Actions on Behalf of the Bankr. Estate (Adv. Dkt. No. 103); Austern Aff. at 5, Hrg. Ex. 6.

[49]     Brett Aff. at 10, Hrg. Ex. 7; Austern Aff. at 5, Hrg. Ex. 6; Disclosure Statement at 32, Hrg. Ex. 1.

[50]     Brett Aff. at 10, Hrg. Ex. 7; Austern Aff. at 5-6, Hrg. Ex. 6.

[51]     Brett Aff. at 8-10, Hrg. Ex. 7; Disclosure Statement at 32, Hrg. Ex. 1; Confirm. Hrg. Tr. at 46.

commencement by Lummus of a separate but related chapter 11 case in connection with a
Lummus pre-packaged plan; and (iv) the conditioning of the Effective Date of the Modified Plan
upon the effective date of the Lummus Plan.[52]

40.    The result of the five months of negotiations, and due diligence by CCC, FCR,
the Lummus FCR, and their retained professionals with respect to ABB and Lummus, was the
increase in consideration to be given to asbestos claimants through the Modified Plan.[53]

41.    The resulting Modified Plan, which is presently before the Court for
confirmation, is fair and feasible. It exacts substantial contributions from contributing parties,
while preserving their financial viability from which the contributions will be made. The level
of compensation to current and future claimants is fair and provides parity of payment between
the clamants paid and to be paid through the prepetition CE Settlement Trust and those to be
paid through the post-confirmation Asbestos PI Trust. The CCC, which objected to the Pre-
Packaged Plan negotiated and has accepted the payment proposed in the Modified Plan.

42.    All Asbestos Claims will be subject to the Channeling Injunction.[54]

43.    Under the Modified Plan, the only impaired creditors are the holders of Asbestos
PI Trust Claims, Participating Claims, and Non-Debtor Affiliate Intercompany Claims.
Additionally, holders of Equity Interests also are impaired under the Modified Plan. All other
classes of creditors are unimpaired under the Modified Plan and will be paid in full.[55]

44.    The Modified Plan contains the following material changes from the Pre-
Packaged Plan:

> -    ABB Additional Contribution:  ABB is making an additional contribution to
>      the Asbestos PI Trust in the amount of $204 million (the "ABB Additional
>      Contribution"). The ABB Additional Contribution is payable from the net

---

52    Brett Aff. at 10-11, Hrg. Ex. 7; Disclosure Statement at 32, Hrg. Ex. 1.
53    Brett Aff. at 9, Hrg. Ex. 7; Austern Aff. at 6, Hrg. Ex. 6; confirm. Hrg. Tr. at 46-47..
54    See Modified Plan, Hrg. Ex. 2.
55    Modified Plan §3.2, Hrg. Ex. 2.

proceeds received from any sale of Lummus, but will be made by ABB in any event not later than two (2) years after the Effective Date or in an amount less than $204 million;

- ABB Promissory Note: The terms of the original ABB Promissory Note in the amount of $350 million have been renegotiated to provide for, among other things: (i) modifications to the promissory note payment schedule, and (ii) contingent payments to be based upon the occurrence of certain EBIT Margin Events (which definition has been modified);

- Guarantees: Guarantees have been extended by ABB and certain ABB Affiliates for all continuing, modified, and additional contributions contemplated by the Modified Plan and supplied by ABB, CE or their Affiliates;

- Lummus Effective Date: The Effective Date of the Modified Plan is conditioned on the occurrence of the "Effective Date" under the Lummus Plan. However, this condition becomes inoperative if Lummus does not commence its own chapter 11 case within 15 days of the Confirmation Order respecting the Modified Plan becoming a Final Order.

- Asbestos PI Trust Distribution Procedures and Asbestos PI Trust Agreement: Certain terms of the Asbestos PI Trust Distribution Procedures and Asbestos PI Trust Agreement under the Modified Plan have been modified;

- Settlement of Preference and Trustee Action: The Settlement Trust Claimants and the Category 4 Participating Claimants (Class 6 Claimants under the Modified Plan) will receive a release of any preference claims, fraudulent transfer claims, and other similar claims that CE may have against them as a consequence of their participation in the CE Settlement Trust and they will be permitted to keep any distributions that have been or will be made to them by the CE Settlement Trust;[56] and

- No Further Distributions to Certain Class 6 Claimants on Account of their Class 6 Claims: Asbestos Claimants in Class 6 consisting of Participating Claimants who have received payments from the CE Settlement Trust or who will receive payments pursuant to the terms of the CE Settlement Trust Documents will not receive any distribution on account of their Stub Claims.[57] However, Non-Qualified Claims, Certified Unpaid Settlement Trust Claims and Subsequent Malignancy Claims will be entitled to receive distributions from the Asbestos PI Trust as and to the extent provided in the Modified Plan and the other Plan Documents.

45.     In addition, the Modified Plan no longer seeks the injunction of the non-

derivative asbestos claims of Lummus and Basic and contains language making it clear that it

---

[56]     Brett Aff. at 9-10, Hrg. Ex. 7; Disclosure Statement at 32-33, Hrg. Ex. 1.
[57]     Brett. Aff. at 13, Hrg. Ex. 7.

applies only to asbestos claims that are or are alleged to be derivative of CE's asbestos liability.[58]

For example, the definition of "CE Asbestos PI Claim" is limited to asbestos claims *"to the extent* arising, directly or indirectly, from acts, omission, business, or operations of [CE] . . . ."[59]

The Channeling Injunction itself contains the following limiting language:

> Anything in the Plan, any Plan Documents, the Confirmation Order or the Channeling Injunction or otherwise to the contrary notwithstanding, the Channeling Injunction shall operate and be construed to stay, restrain and enjoin Asbestos Claims and Demands (subject also to the other limitations set forth in the Plan and Plan Documents) *only as to such Asbestos Claims and Demands (whether now existing or hereafter arising) based upon the Debtor's direct or indirect liability or alleged liability.*[60]

46.     Identical language limits the scope of the Modified Plan's releases with respect to Asbestos Claims.[61]

**TDP Revisions**

47.     The TDP also has been modified since it was filed with the Prepackaged Plan.

The modifications to the TDP were the result of arms-length negotiations conducted in good faith among the CCC, the FCR, the Debtor, representatives of other individual asbestos claimants, and the retained professionals for each of the foregoing, to address the parity issues between and among the holders of Class 5 and Class 6 Claims. Principal changes include:

- Settlement Trust Claims are ineligible to participate and shall not receive payment from the Asbestos PI Trust;

- Claimants who hold Non-Qualified Claims or Certified Unpaid Settlement Trust Claims are eligible to submit such claims to the Asbestos PI Trust for evaluation, determination and payment (if and to the extent eligible) in accordance with the terms of the TDP. Non-Qualified Claims are subject to a filing deadline and filing fee;

---

58 _____ ___ ____ __ ___ _____ __ _ _____ _ _ _____ _ _

Brett Aff. at 16, Hrg. Ex. 7; Confirm. Hrg. Tr. at 52.
59    Glossary at 8 (emphasis added), attached to Hrg. Ex. 1.
60    Modified Plan § 7.15.4 (emphasis added), Hrg. Ex. 2.
61    Modified Plan § 11.8.6, Hrg. Ex. 2.

- Clarifications that Holders of Subsequent Malignancy Claims may assert such claims against the Asbestos PI Trust;

- The claims payment ratio has been adjusted from 58% for Category A Claims/42% for Category B Claims, to 87% for Category A Claims/13% for Category B Claims, thereby resulting in the increased availability of funds for the payment of malignancy claims;

- The Asbestos PI Trust's ability to ensure that the medical evidence provided in support of a claim is credible and consistent with recognized medical standards has been enhanced, and the requirements for medical evidence to support a claimant's Disease Level have been strengthened. For example, all diagnoses must be based upon a physical examination of the claimant by the physician providing the diagnosis, all diagnoses of non-malignant disease must be based on an X-ray reading by a certified B-reader or a CT scan, and all diagnoses of malignant disease must be based upon a diagnosis by a board-certified pathologist, in each instance except in the case of a claimant who was deceased at the time the claim was filed;

- The Scheduled Values and Average Values of several Disease Levels have been reduced in order to reflect more closely the amounts paid on average by CE in prior settlements; and

- The Maximum Annual Payment as of the Effective Date of the Modified Plan has been set at $75,000,000 in order to help ensure that funds will be available for the duration of the Asbestos PI Trust.[62]

## Resolution of the Issues Raised by the Third Circuit

48.     In its decision, the Third Circuit held that there were insufficient factual findings to support "related-to" jurisdiction over asbestos personal injury claims of Lummus and Basic to the extent such claims were non-derivative of CE asbestos personal injury claims.[63] The Third Circuit further held that neither section 105 nor section 524(g) of the Bankruptcy Code permit the extension of a channeling injunction to claims that are non-derivative of CE's obligations and section 105 cannot be viewed as expanding the rights available under section 524(g) for this purpose.[64] With regard to the two-trust structure, the Third Circuit remanded the Pre-Packaged Plan to determine whether current and future asbestos personal injury claimants received fair

---

[62]     Austern Aff. at 7-8, IIrg. Ex. 6; Confirm. IIrg. Tr. at 53-54..

[63]     *Combustion Eng'g*, 391 F.3d at 230-31.

[64]     *Id.* at 233, 235-37.

treatment in light of the pre-petition payments made to certain Participating Claimants.[65]
Additionally, the Third Circuit remanded for further consideration of whether payments under
the CE Settlement Trust constituted voidable preferences that were inconsistent with the fair
distribution scheme of the Bankruptcy Code and whether stub claims would artificially impair
the voting by inclusion in the same class as non-settling claims.[66]

### A. Non-Derivative Claims of Lummus and Basic Have Been Eliminated From The Modified Plan

49.    The Modified Plan no longer addresses the non-derivative asbestos personal
injury claims of Basic and Lummus.[67]  Thus, the Modified Plan no longer seeks the extension of
a channeling injunction to claims that are not derivative of CE's obligations, and fully complies
with the limitations on the scope of available relief under section 524(g) of the Bankruptcy
Code, as set forth in the Third Circuit Opinion.[68]

---

[65]    *Id.* at 239-42, 245-47.
[66]    *Id.* at 240-42.
[67]    Brett Aff. at 16, Hrg. Ex. 7; Confirm. Hrg. Tr. at 52-53.
[68]    Confirm. Hrg. Tr. at 52-53.

**B.     Additional Consideration Provided Under the Modified Plan
and the Release of the Stub Claims Ensures All Holders of
Asbestos Claims Receive Fair Treatment and Voting Issues**

50.     The ABB Additional Contribution and the agreement by Participating Claimants
who received payment from the CE Settlement Trust to release their Stub Claims, along with the
revisions to the TDP, provide the parity between the payments made to Settlement Trust
Claimants and Category 4 Participating Claimants by the CE Settlement Trust, and the payments
that claimants will receive under the Asbestos PI Trust, that is required pursuant to the Third
Circuit Opinion.[69]

51.     Rather than seeking to recover the payments made by the CE Settlement Trust to
approximately 154,000 Participating Claimants through the continued prosecution of the
Trinchese Complaint, the Modified Plan proposes to fund the Asbestos PI Trust with additional
consideration so that there will be parity between the post confirmation distributions to Asbestos
PI Trust Claimants and the payments to Settlement Trust Claimants and Category 4 Participating
Claimants by the pre-petition CE Settlement Trust.[70]  Specifically, the Asbestos PI Trust is
entitled to receive additional contributions from ABB of $204 million and from the CE
Settlement Trust of $2 million.[71]  These additional contributions will permit payment to all
claimants, current and future, that did not participate in the CE Settlement Trust in parity with
the payments made to Settlement Trust Claimants and Category 4 Participating Claimants from
the CE Settlement Trust.

52.     Furthermore, under the Modified Plan, Asbestos Claimants in Class 6 consisting
of Settlement Trust Claimants and Category 4 Participating Claimants who have received
payments from the CE Settlement Trust or who will receive payments pursuant to the terms of

---

[69]     Brett Aff. at 13-15, Hrg. Ex. 7; Confirm. Hrg. Tr. at 49-51.
[70]     Brett Aff. at 11, Hrg. Ex. 7; Austern Aff. at 8-9, Hrg. Ex. 6; Confirm. Hrg. Tr. at 49-51.
[71]     Brett Aff. at 12-15, Hrg. Ex. 7; Confirm. Hrg. Tr. at 50-51.

the CE Settlement Trust Documents will give up their right to receive any distribution on account of their Stub Claims, but will be permitted to retain their payments from the CE Settlement Trust and be released from any preference or similar liability on account of those payments.[72] This plan modification clearly changes the expectations of the Stub Claim holders who will receive nothing more than their entitlement under the CE Settlement Trust, and is an impairment of those claims, entitling them to vote. Thus, the Modified Plan does not artificially impair and does not impermissibly (or otherwise) skew the class membership or voting.

53.     The modifications to the Modified Plan with respect to the classification and treatment of asbestos claims accomplish parity among tort claim holders in the fairest way possible.[73] All holders of Asbestos Claims against CE are divided into two classes: (i) claims of holders who did not participate in the CE Settlement Trust (Class 5 Asbestos PI Trust Claims), and (ii) claims of holders who did participate in the CE Settlement Trust (Class 6 Participating Claims).[74]   There are a number of sub-classes of claimants contained within each class, but, as a general rule with some exceptions, Class 5 Asbestos PI Trust Claimants are those persons who did not participate in the CE Settlement Trust with asbestos personal injury claims against CE, while Class 6 Participating Claimants are those persons who participated in the CE Settlement Trust.[75]   Thus, the Modified Plan does not aggregate the stub claims in the same class as non-settled claims. The separation of classes is appropriate, given the distribution structure of the Modified Plan.

54.     Class 5 Asbestos PI Trust Claimants will be subject to the Channeling Injunction, which requires that their claims can only be asserted against the Asbestos PI Trust.  Class 6

---

[72]        Confirm. Hrg. Tr. at 50-51.

[73]        Brett Aff. at 13, Hrg. Ex. 7; Austern Aff. at 7, Hrg. Ex. 6 ("the Modified Plan . . . is fundamentally fair to holders of Demands").

[74]        Modified Plan §§ 3.2.5, 3.2.6, Hrg. Ex. 2; Brett Aff. at 13, Hrg. Ex. 7; Disclosure Statement at 42-43, Hrg. Ex. 1.

[75]        Brett Aff. at 12, Hrg. Ex. 7.

22

Participating Claimants will also be subject to the Channeling Injunction; however, the treatment of a holder of a Class 6 Claim depends upon whether the holder received or will receive a distribution from the CE Settlement Trust.[76]

55.     From and after the Effective Date, the Settlement Trust Claimants and Category 4 Participating Claims can only seek recovery on their asbestos personal injury claims against the CE Settlement Trust.[77]  On the other hand, holders of Participating Claims who did not or will not receive distributions from the CE Settlement Trust may submit their asbestos personal injury claims to the Asbestos PI Trust for payment (if and to the extent entitled to payment under the Asbestos PI Trust Documents).[78]  Under the facts of this case, this classification and treatment achieves the twin goals of allowing parity between the claimants who have or will receive distributions from the pre-petition CE Settlement Trust and non-participating Asbestos PI Trust Claimants, while at the same time allowing those individuals who will not receive any distribution from the CE Settlement Trust the opportunity to qualify for payment under the Asbestos PI Trust.[79]  The CCC now supports the Modified Plan.

## C.     The CE Settlement Trust Settlement Agreement

---

[76]        Brett Aff. at 12, Hrg. Ex 7; Plan § 7.15, Hrg. Ex. 2; Disclosure Statement at 50-51, Hrg. Ex. 1.

[77]        Modified Plan § 3.2.6.2, Hrg. Ex. 2; Disclosure Statement at 8-9, 42-43, Hrg. Ex. 1; Brett Aff. at 12, Hrg. Ex. 7.

[78]        Modified Plan § 3.2.6.2, Hrg. Ex. 2; Disclosure Statement at 8-9, 42-43, Hrg. Ex. 1; Brett Aff. at 12-13, Hrg. Ex. 7.

[79]        Brett Aff. at 13, Hrg. Ex. 7.

23

56.     Finally, as part of the negotiations leading up to the Modified Plan, the CE Settlement Trust will pay $2 million to the Asbestos PI Trust in return for a release of any preference claims, fraudulent transfer claims, and other similar claims that CE may hold against it and a dismissal of the Trinchese Complaint.[80]  This settlement is memorialized in the CE Settlement Trust Settlement Agreement attached as Exhibit J to the Modified Plan.

57.     The releases in conjunction with the settlement of the Trinchese Complaint including, but not limited to, the provisions of sections 7.2.14 and 11.8.2 of the Modified Plan (collectively, the "Releases") are fair and equitable, and necessary components of the Modified Plan and the reorganization of the Debtor.  The parties have had adequate notice of the Releases. The overall structure of the Modified Plan is intended to and does create parity between the Settlement Trust Claimants, on the one hand, and the non-participant and future claimants, on the other hand.[81]  The Releases are supported by the consideration and are part of the overall structure of the Modified Plan.  Parity among Claimants is a cornerstone of the Modified Plan.

## The Lummus Plan and the Lummus Feasibility Requirement

58.     Even though the non-derivative claims of Lummus are no longer subject to the Channeling Injunction, this Plan still requires that Lummus fully and finally resolve its asbestos liabilities because the timing of the ABB Additional Contribution is affected by, but not dependent upon, a sale of Lummus -- a sale that the parties in this case agree is unlikely to occur if Lummus remains saddled with its asbestos liabilities.[82]

59.     Accordingly, negotiations began on a parallel track with an individual appointed by Lummus to represent the interests of its future asbestos claimants, Mr. Richard Schiro (the "Lummus FCR").[83]  Following months of negotiations and due diligence by the Lummus FCR,

---

[80]     Brett Aff. at 13, Hrg. Ex. 7; Disclosure Statement at 48, Hrg. Ex. 1; Confirm. Hrg. Tr. at 51.
[81]     Confirm. Hrg. Tr. at 49-52.
[82]     Brett Aff. at 17, Hrg. Ex. 7; Duplantier Aff. at 4, Hrg. Ex. 5; Confirm. Hrg. Tr. at 68.
[83]     Brett Aff. at 17-18, Hrg. Ex. 7.

24

the parties agreed to the terms of a pre-packaged plan for Lummus that would mirror many of the terms of the Modified Plan and seek to channel all of Lummus' asbestos liability to a section 524(g) trust.[84]

60.    On August 31, 2005, the Lummus Plan was sent out to all impaired creditors for voting.[85]

61.    The material terms of the Lummus Plan are as follows:

-    The asbestos trust created under the Lummus Plan ("Lummus Asbestos PI Trust") is entitled to receive an interest bearing note in the principal amount of $33 million (the "Lummus Note"), which note also provides that in the event of a default under the note, the Lummus Asbestos PI Trust is entitled to 51% of the shares of the capital stock of Lummus in accordance with the terms of the Pledge and Irrevocable Proxy (as that term is defined in the Lummus Glossary);

-    The Lummus Asbestos PI Trust also is entitled to be paid the first $7.5 million in aggregate recoveries from Lummus insurers, with the first $5 million guaranteed.

-    The Lummus Plan provides for the issuance of the Lummus Asbestos PI Channeling Injunction (as defined in the Lummus Glossary) pursuant to sections 524(g) and 105 of the Bankruptcy Code, pursuant to which all Lummus Asbestos PI Trust Claims shall be channeled to the Lummus Asbestos PI Trust.[86]

62.    On the basis of the record now before this Court, it appears that Lummus' asbestos claims negatively impact its value to such an extent that, for all intents and purposes, it cannot be sold unless and until its asbestos liabilities are fully and finally resolved and that resolution will be accomplished pursuant to a channeling injunction under section 524(g) of the Bankruptcy Code.[87]

---

[84]    Brett Aff. at 17, Hrg. Ex. 7; Duplantier Aff. at 5, Hrg. Ex. 5.

[85]    Brett Aff. at 18, Hrg. Ex. 7; Duplantier Aff. at 5, Hrg. Ex. 5.

[86]    Duplantier Aff. at 5-6, Hrg. Ex. 5; Lummus Disclosure Statement at 2-3, Hrg. Ex. 19.

[87]    Duplantier Aff. at 7, Hrg. Ex. 5; June 23 Findings & Conclusions at 7, Hrg. Ex. 210; 5/1/03 Hrg. Tr. at 314 (Austern), Hrg. Ex. 26; Confirm. Hrg. Tr. at 68-70.

63.     Because of the importance of the ABB Additional Contribution to achieve the parity required by the Third Circuit Opinion, and because the timing of the ABB Additional Contribution is affected by any sale of Lummus, the feasibility of the Modified Plan is expressly conditioned upon the effectiveness of the proposed Lummus Plan.[88]

64.     This Court has had an opportunity to review (i) the Lummus Plan that has been voted upon by all impaired creditors and the disclosure statement used by such creditors in connection with voting on the Lummus Plan; (ii) all of the financial documents that provide for the funding of the Lummus Asbestos PI Trust; and (iii) the Affidavit of Margaret Duplantier in Support of Confirmation of Combustion Engineering's Plan of Reorganization, As Modified Through August 19, 2005, sworn to on September 9, 2005 (the "Duplantier Affidavit"). Although this Court cannot predetermine whether the Lummus Plan, which has not been filed in any bankruptcy case, is feasible, a review of the Lummus Plan and the documents and evidence related to it, and the fact that ABB has agreed to pay the ABB additional contribution, whether or not the Lummus sale occurs, renders the Modified Plan feasible.

65.     This Court accepts the representations in the affidavits submitted in support of confirmation of the Modified Plan respecting the Lummus Plan as true and based thereon, finds that conditioning the Effective Date of the Modified Plan upon the Lummus Effective Date does not render the Modified Plan unfeasible. This is buttressed by the fact that the condition is satisfied if Lummus fails to file its own bankruptcy case within 15 days of the effective date of the Modified Plan. The facts and Lummus Plan documents are uncontested on the record now before the Court and are accepted only for purposes of making the findings and conclusions related to the conditions in the Modified Plan that are related to the Lummus pre-packaged plan.

---

[88]     Brett Aff. at 18, Hrg. Ex. 7; Duplantier Aff. at 7, Hrg. Ex. 5; Confirm. Hrg. Tr. at 68-71.

26

Nothing in these findings and conclusions constitutes a ruling or determination that the Lummus Plan is or is not feasible or confirmable.

### Debtor's Business and Financial Affairs

**A.    CE's Ongoing Business Operations Satisfy the Requirements for Obtaining A Discharge Under Section 1141(d) of the Bankruptcy Code**

66.    CE's principal office is located in Norwalk, Connecticut. Under the Modified Plan, the Debtor's business will remain unchanged. Specifically, the Reorganized Debtor will own and operate the Connecticut Site. The Connecticut Site consists of approximately 544 acres and approximately 440,000 square feet of rentable space. The Debtor is not selling this asset pursuant to the Modified Plan and will continue to own and operate it as of the Effective Date.[89]

67.    CE currently leases space on the property to tenants under the following separate agreements:

i.    ABB Inc. CE currently leases 166,700 square feet of office space to ABB Inc. at a rate of $14.50 per square foot ("PSF") gross under a written lease with a term that runs from June 1, 2005 to May 31, 2010. The lease requires ABB Inc. to pay increases in operating expenses over the base year (2005). The office space leased to ABB Inc. includes the space that was formerly leased to Westinghouse. It is projected that, on a full year basis, leasing revenue under the ABB Inc. lease will account for approximately 30% of the Debtor's total leasing revenue.

ii.   Alstom. In connection with the unwinding of the Joint Venture, fossil power assets originally contributed to the Joint Venture by CE were sold to Alstom following the dissolution of the Joint Venture. Certain of these fossil power assets continue to be operated on the Connecticut Site by Alstom, which has effectively made the site the headquarters of Alstom's United States operations. Currently, CE leases 261,552 square feet of office, flex, research, and development space to Alstom at a rate of $21.30 psf gross. According to the lease, which expires on April 30, 2010, operating expenses are to be increased annually in accordance with the consumer price index. The Debtor projects that leasing revenues under the Alstom lease will account for 70% of the Debtor's total leasing revenue in 2005.

---

[89]    Brett Aff. at 18, Hrg. Ex. 7.

iii    Month-to-Month.  CE currently leases 3,580 square feet of additional office space to Alstom on a month-to-month basis at a rate of $16.50 psf gross.[90]

After the Effective Date, the Debtor will continue its commercial real estate leasing business.[91]

68.    Thus, confirmation of the Modified Plan will not result in the liquidation of all or substantially all of the property of CE's Estate, nor will CE cease to do business after consummation of the Modified Plan.  Instead, based on the uncontested and unopposed evidence in the record, this Court finds that CE will engage in business operations following the Effective Date of the Modified Plan, and is thus entitled to the benefit of a discharge under section 1141(d) of the Bankruptcy Code.[92]

### B.    CE's Contributions to the Trust Satisfy the Funding Requirements Of Section 524(g)(2)(B)(i)(II) of the Bankruptcy Code

60.    There have been no material adverse changes to the businesses of CE or ABB since entry of the June 23 Findings and Conclusions that would suggest that CE and ABB will not be able to satisfy their respective obligations under the Modified Plan.  In fact, ABB is now in a far more financially secure position in comparison to its status in 2003.[93]

70.    The evidence before this Court establishes that, once the Connecticut Site is fully remediated with the assistance of the CE Environmental Indemnity, the Connecticut Site will have a value of at least $20 million[94] — an amount equal to CE's obligations under the CE Promissory Note.[95]

71.    Moreover, pursuant to the Modified Plan, the Asbestos PI Trust will have the ability under the CE Promissory Note to take full advantage of any appreciation in the value of

---

[90]    Brett Aff. at 19, Hrg. Ex. 7.
[91]    Brett Aff. at 18, Hrg. Ex. 7.
[92]    Confirm. Hrg. Tr. at 59-66.
[93]    Brett Aff. at 19, Hrg. Ex. 7.
[94]    Karlbergs Aff. at 4, Hrg. Ex. 16; Knaurhase Aff. at 4, Hrg. Ex. 15; Confirm. Hrg. Tr. at 60.
[95]    Plan, Ex. A, Hrg. Ex. 2; Confirm. Hrg. Tr. at 60.

the Connecticut Site by converting its claim under the CE Promissory Note into as much as 95% of CE's outstanding equity.[96]

72.       Accordingly, the Modified Plan is funded, in part, by the CE Promissory Note which, as a security of the Debtor, is sufficient to satisfy the requirement of section 524(g)(2)(B)(i)(II) of the Bankruptcy Code.[97]

73.       CE's contributions to the Asbestos PI Trust, together with the other substantial contributions to the Asbestos PI Trust, including, *inter alia*, the ABB Promissory Note, the ABB Stock, the Insurance Assignment Agreement, and the Contribution Agreement, are a sufficient and reliable pool of assets to pay the present and future claims of the Asbestos PI Trust in accordance with the terms of the TDP.[98]

---

[96]    Plan, Ex. A, Hrg. Ex. 2; Confirm. Hrg. Tr. at 50, 60.
[97]    Confirm. Hrg. Tr. at 60.
[98]    Austern Aff. at 8, Hrg. Ex. 6.

**The Modified Plan is in the Best Interests of CE's Present Creditors**

74.     The Modified Plan includes substantial financial contributions from ABB, and thus provides for superior treatment to claimants against the Debtor than would be possible in the context of any independent, stand-alone resolution of CE's asbestos liability.

75.     This Court previously found that the anticipated recoveries by impaired claimants under the Debtor's Pre-Packaged Plan were in excess of what those same claimants could expect to receive in a chapter 7 liquidation of the Debtor[99] and reaffirms that finding now.  Accordingly, because the Modified Plan presently before the Court provides for increased contributions over and above what was already provided for in the Pre-Packaged Plan, the Modified Plan necessarily provides the Debtor's impaired creditors with more value than they would receive in a chapter 7, and the best interests test of 11 U.S.C. § 1129(a)(7) is clearly satisfied.

76.     Further support for this finding comes from the liquidation analysis provided by Pamela Zilly, Senior Managing Director of The Blackstone Group, L.P., CE's financial advisor. Ms. Zilly has extensive experience working on chapter 11 restructurings, advising both debtors and creditors in various financial distress situations.[100]

77.     Ms. Zilly's analysis demonstrates that, in a liquidation scenario, CE's available assets would most likely range from $301 million to $783 million.[101]  After deductions for expected priority claims and administrative expenses, the net proceeds available to general unsecured creditors, Asbestos PI Trust Claimants and other claimants would range from $287 million to $759 million.[102]

---

[99]     June 23 Findings & Conclusions at 53, Hrg. Ex. 210.
[100]     Zilly Aff. at 2, Hrg. Ex. 8.
[101]     Zilly Aff. at 3, Hrg. Ex. 8.
[102]     Zilly Aff. at 4, Hrg. Ex. 8.

78.     However, in a liquidation scenario, these available proceeds would be further depleted by CE's exposure to potential environmental claims, which could range from $100 million to $224 million.[103]

79.     Ms. Zilly's analysis further reveals that CE would likely face between $1,495,653,000 and $1,788,653,000 in total general unsecured claims, meaning that the expected recovery by general unsecured creditors in a chapter 7 liquidation would be somewhere between 19.2% and 42.4% on the dollar[104] – recoveries that are lower than those provided for under the Modified Plan.

80.     Under the Modified Plan, general unsecured creditors will receive distributions equal to 100% of their allowed claims.[105] Moreover, after considering the impact of ABB's contributions of cash and stock, it is clear that Asbestos PI Trust Claimants will also receive recoveries in excess of the 42.4% recovery projected in a liquidation scenario.[106] Furthermore, a chapter 7 liquidation of CE would yield nothing at all for future claimants.

81.     Accordingly, confirmation of the Modified Plan is manifestly in the best interests of all of the Debtor's creditors.

**The Modified Plan Is in the Best Interests of CE's Future Creditors**

82.     As noted above, in a chapter 7 liquidation of CE, future claimants would recover nothing.[107] By contrast, under the Modified Plan, future claimants are anticipated to receive distributions of approximately 48.33% from the Asbestos PI Trust.[108]

---

[103]     Zilly Aff. at 4, Hrg. Ex. 8.
[104]     Zilly Aff. at 4, Hrg. Ex. 8.
[105]     Modified Plan, § 3.2.4.2, Hrg. Ex. 2.
[106]     Bhagavatula Aff. at 5, Hrg. Ex. 11 (incorporating conclusions contained within Radecki Aff. at 3, Hrg. Ex. 12).
[107]     Austern Aff. at 9, Hrg. Ex. 6.
[108]     Bhagavatula Aff. at 5, Hrg. Ex. 11.

83.     Based on the testimony provided by the Future Claimants' Representative and his professionals, as well as a review of the Modified Plan itself, it is clear that the Modified Plan provides for the creation of a sufficient and reliable pool of assets such that the payments to both present and future claims will be made in a substantially similar manner, all in accordance with the terms of the TDP.[109]

84.     The holders of Demands will fare better under the Modified Plan than they would in a Chapter 7 liquidation inasmuch as in a Chapter 7 liquidation, the assets being contributed by ABB and other ABB-affiliated entities would not be available to satisfy the claims of future claimants.[110]

85.     The FCR has further testified that, in his opinion, the identification of the Asbestos Protected Parties in the Channeling Injunction is fair and equitable with respect to persons who might subsequently assert asbestos-related Demands against any such Asbestos Protected Party in light of the benefits provided and to be provided to the Asbestos PI Trust.[111]

86.     In light of the uncontradicted evidence in the record, confirmation of the Modified Plan is in the best interests of, and is fair and equitable to, persons who might subsequently assert Demands against the Asbestos Protected Parties.

87.     The Modified Plan also satisfies any requirement imposed pursuant to the Third Circuit decision that there be parity between the distributions under the MSA and distributions to non-MSA Participants and future claimants under the Modified Plan:[112]

-   Participating Claimants that received distributions from the CE Settlement Trust have received, on average, 45.5% of their claims.[113]

---

[109]   Austern Aff. at 8, Hrg. Ex. 6.
[110]   Austern Aff. at 9, Hrg. Ex. 6.
[111]   Austern Aff. at 8, Hrg. Ex. 6.
[112]   Austern Suppl. Aff. at 5, Hrg. Ex. 10.
[113]   Dickhoff Aff. at 3, Hrg. Ex. 9.

- Under the Modified Plan, the Class 5 Claimants and future claimants will receive distributions of approximately 48.33% of their claims.[114]

## The Modified Plan Solicitation Process Regarding Asbestos Personal Injury Claims

88.     The Debtor's resolicitation process began with letters dated July 27, 2005 (the "Pre-Solicitation Letters") distributed by mail to every attorney who cast a Master Ballot in connection with the Pre-Packaged Plan ("Master Ballot Agents"). One version of the Pre-Solicitation Letter was sent to Master Ballot Agents who had cast valid Master Ballots. Another version of the Pre-Solicitation Letter was sent to Master Ballot Agents who cast votes by Master Ballot for their clients with Asbestos PI Trust Claims, but which Master Ballot was deficient because neither the Debtor's Agent, Connecticut Valley Claims Service Company, or its former balloting agent, The Trumbull Group, had received the required power of attorney for each client's vote on the Master Ballot. Each Pre-Solicitation Letter informed the Master Agent that they would receive one copy of the Resolicitation Package unless they requested a Resolicitation Package to be sent to each of their clients by the Debtor, or requested that the Debtor send the Master Ballot Agent sufficient Resolicitation Packages so that the Master Ballot Agent could mail the Resolicitation Packages directly to clients. Master Ballot Agents who had not previously submitted powers of attorneys were instructed that they needed to provide them to the Balloting Agent for any new Master Ballot to be deemed valid.

89.     Commencing on or about August 23, 2005 and continuing through August 26, 2005, packages containing the Disclosure Statement, the Modified Plan, a Class 5 Master Ballot and Class 6 Master Ballot, letters from the Future Claimants' Representative David Austern, Debtor's Counsel, Kirkpatrick & Lockhart Nicholson Graham LLP by Jeffrey N. Rich, Unsecured Creditors' Committee Counsel, Frank/Gecker LLP by Joseph Frank, and a self-

---

[114]     Bhagavatula Aff. at 5, Hrg. Ex. 11 (incorporating conclusions contained within Radecki Aff. at 3, Hrg. Ex. 12).

addressed return envelope to mail the Ballot ("Resolicitation Packages") were served by first

class mail, postage prepaid to all Master Ballot Agents. In addition, all individuals who cast a

Class 5 Individual Ballot in connection with the Pre-Packaged Plan of Reorganization, were sent

either a Resolicitation Package containing: (i) a Class 6 individual Ballot, if the individual was a

holder of a Participating Claim, or (ii) a Class 5 individual Ballot, if the individual was the

holder of an Asbestos PI Trust Claim. Thus, all known Class 5 and Class 6 claimants and/or

their counsel were served with all the Plan Documents.

**Balloting Results With Respect to the Modified Plan Regarding Asbestos Personal Injury Claims**

90.     Votes were received by Bankruptcy Services, LLC, the Debtor's balloting agent ("Balloting Agent") beginning on or about September 1, 2005 and continuing through and including 4 p.m. on September 19, 2005 (the "Voting Deadline"). Class 5 and 6 Individual and Master Ballots received by the Voting Deadline were considered timely cast. Pursuant to the Scheduling Order, all votes cast in connection with the Pre-Packaged Plan were deemed cast in connection with the Modified Plan unless the claimant changed his voting by casting a Class 5 or Class 6 Individual or Master Ballot on or before the Voting Deadline.

91.     Based on the results stated in the Affidavit of Kathy Gerber Certifying the Individual Ballots and Master Ballots Accepting and Rejecting Combustion Engineering's Plan of Reorganization, as Modified Through August 19, 2005, sworn to on September 23, 2005 (the "Original Gerber Affidavit"),[115] ballots were received from or on behalf of 29,750 Class 5 Asbestos PI Trust Claimants. 95.78% of these ballots were cast in favor of the Modified Plan. According to the Original Gerber Affidavit, ballots were received from or on behalf of 107,002 Class 6 CE Settlement Trust Participants. 95.79% of these ballots were cast in favor of the Modified Plan. All of these votes have been reviewed and deemed eligible and valid. All votes cast by a Class 5 or Class 6 Master Ballot were reviewed and determined to have been cast with the appropriate powers of attorney.

92.     The Balloting Agent calculated the values of all of the Class 5 votes using three different methods of valuation as instructed by the Debtor. As certified in the Supplemental Affidavit of Kathy Gerber Certifying the Individual Ballots and Master Ballots Accepting and Rejecting Combustion Engineering Inc.'s Plan of Reorganization as Modified Through August

---

[115]     Gerber Aff. at 5, Hrg. Ex. 244.

19, 2005 dated September 27, 2005,[116] no matter which method of valuation was utilized, no less than 94% of the total value of voting Class 5 Asbestos PI Trust Claims voted in favor of the Modified Plan. Using the settlement and historical values as approved by the Court in the Scheduling Order, approximately 95% of the total value of voting Class 6 Participating Claims voted in favor of the Modified Plan.

93. Based on the overwhelming number of votes cast in favor of the Modified Plan by the Class 5 and Class 6 Claimants who voted and the value of such ballots, for purposes of sections 524(g), 1226(c), and 1129(a) of the Bankruptcy Code, the Debtor has received sufficient votes for the Modified Plan to have been accepted by holders of not less than two-thirds (2/3) in amount and seventy-five percent (75%) in number of Class 5 Asbestos PI Trust Claims and Class 6 CE Settlement Trust Claims that cast valid ballots.[117]

**Ballot Solicitation and Vote Results – Summary as to All Classes**

94. The affidavit of BSI, LLC's representative, Cassandra Murray, sworn to September 23, 2005, (Docket No. 2543) reflects:

> (i) service of the Debtor's Solication Package which included the Plan Documents to all Class 5 and Class 6 Claimants and/or their counsel of record entitled to vote on the Modified Plan and the Non-Voting Notice to all known Class 1, 2, 3 and 4 Claimants and those persons requesting notice pursuant to Bankruptcy Rule 2002 who were not entitled to vote to accept or reject the Modified Plan, and (ii) service of the Confirmation Hearing Notice on (1) the US Trustee, (2) counsel who previously submitted a valid Master Ballot, (3) all creditors on the list of creditors maintained by the Debtor's Solicitation Agent in the Chapter 11 Case who previously submitted an individual Ballot, (4) counsel for the Unsecured Creditors' Committee, and (5) those parties who requested notice pursuant to Bankruptcy Rule 2002 and (b) the Certificate of Publication filed September 20, 2005, reflecting publication of the Notice of (I( Hearing to Confirm Modified Plan of Reorganization and (II) Date by Which to File and Serve Objections (the "Confirmation Hearing Notice") in the August 25, 2005 edition of The Wall Street Journal (National Edition) (Dkt. No. 2514).

---

[116] Gerber Supplemental Aff. at 4, Hrg. Ex. 246.
[117] Confirm. Hrg. Tr. at 48, 80.

95. Classes 1, 2, 3 and 4 are unimpaired and are deemed to have accepted the Modified Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 5, 6, 7 and 8 are impaired. As discussed above, Class 5 Asbestos PI Trust Claims and Class 6 Participating Claims have overwhelmingly voted in favor of the Modified Plan. No entity has asserted a claim that falls within Class 7. Class 8 has also voted in favor of the Modified Plan.

**Findings Requested in The Modified Plan**

96. Based upon the Court's review of the record in this case and the testimony and evidence adduced at the Confirmation Hearing, the Court makes the findings enumerated below, which findings satisfy Section 7.10 of the Modified Plan.

97. The Channeling Injunction and the Asbestos Insurance Entity Injunction are to be implemented in accordance with the Modified Plan and the Asbestos PI Trust Documents.

98. As of the Petition Date, the Debtor has been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

99. The Asbestos PI Trust is to be funded in part by securities of the Debtor and by the obligations of the Debtor to make future payments.

100. The Asbestos PI Trust, on the Effective Date, by the exercise of rights granted under the Modified Plan, would be entitled to own, if specific contingencies occur, the majority of the voting shares of the Reorganized Debtor.

101. The Asbestos PI Trust is to use its assets and income to pay Asbestos PI Trust Claims, Non-Qualified Claims, and Certified Unpaid Settlement Trust Claims in accordance with the Asbestos PI Trust Agreement and TDP.

102. The Debtor is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Claims, which are addressed by the Asbestos PI Channeling Injunction and the Asbestos Insurance Entity Injunction.

103. The actual amounts, numbers, and timing of Demands cannot be determined.

104. Pursuit of Demands outside the procedures prescribed by the Modified Plan and the TDP is likely to threaten the Modified Plan's purpose to deal equitably with Asbestos Claims.

105. The terms of the Channeling Injunction and the Asbestos Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in the Modified Plan and described in the Disclosure Statement.

106. Pursuant to court orders, the TDP or otherwise, the Asbestos PI Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos PI Trust Claims, Non-Qualified Claims, and Certified Unpaid Settlement Trust Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos PI Trust shall value, and be in a financial position to pay, present Asbestos PI Trust Claims, Non-Qualified Claims, and Certified Unpaid Settlement Trust Claims and future Asbestos PI Trust Claims in substantially the same manner.

107. The Future Claimants' Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction and the Asbestos Insurance Entity Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that would constitute Asbestos PI

Trust Claims and are addressed in the Channeling Injunction and the Asbestos Insurance Entity Injunction and transferred to the Asbestos PI Trust.

108.    The Asbestos PI Trust will be funded with a sufficient and reliable pool of assets that will allow the Asbestos PI Trust to adequately pay Asbestos PI Trust Claims, Non-Qualified Claims and Certified Unpaid Settlement Trust Claims.

109.    In light of the benefits provided, or to be provided, to the Asbestos PI Trust and the CE Settlement Trust on behalf of each Asbestos Protected Party, the Channeling Injunction and the Asbestos Insurance Entity Injunction are fair and equitable with respect to the persons that might subsequently assert Demands that would constitute Asbestos Claims against any Asbestos Protected Party or any CE Settlement Trust Protected Party. The Channeling Injunction is also fair and equitable with respect to the Settling Asbestos Insurance Companies.

110.    The Channeling Injunction is properly entered and implemented pursuant to Section 524(g) of the Bankruptcy Code.

111.    The dependency of the Effective Date upon the occurrence of the Lummus Effective Date does not render the Modified Plan unfeasible.

112.    The Modified Plan and its acceptance otherwise comply with section 524(g) of the Bankruptcy Code.

113.    Subject to Section 3.2.4.4 of the Plan, the Asbestos PI Trust shall have the sole and exclusive authority as of the Effective Date to assert the rights and defenses of Asbestos Protected Parties with respect to all Asbestos Claims other than any such rights against any Released Parties. The Asbestos PI Trust has no responsibility, liability or obligation for or in respect of Settlement Trust Claims or Category 4 Participating Claims and nothing herein imposes or is intended or shall be deemed to impose any responsibility, liability, or obligation on

the Asbestos PI Trust for or in respect of Settlement Trust Claims or Category 4 Participating Claims.

114.   The Channeling Injunction and the Asbestos Insurance Entity Injunction are essential to the Modified Plan and the Debtor's reorganization efforts.

115.   ABB's contribution of the ABB Contribution to the Asbestos PI Trust and the Debtor's and ABB Holdings' contribution of the CE Contribution to the Asbestos PI Trust, together with the Asbestos Insurance Assignment, constitute substantial assets of the Modified Plan and the reorganization.

116.   In accordance with an agreement, CE has not sought, as part of the plan confirmation process, and the Court is not making, a valuation of the CNA Insurers' indemnity claims with respect to the Neles-Jamesbury suit. Solely for purposes of feasibility of the Modified Plan, in respect to all other indemnities whether under the Subject Insurance Agreements or otherwise, the value of the Debtor's liability on account of indemnity claims that have been asserted to date is zero dollars ($0).

**Appointment of Trust Advisory Committee**

117.   The Unsecured Creditors' Committee and the CCC have, pursuant to section 7.2.3 of the Modified Plan, nominated the following individuals as members of the Trust Advisory Committee:  Russell W. Budd, John D. Cooney, Brent Coon, Steven Kazan, and Matthew P. Bergman.

**Appointment of Trustees of Asbestos PI Trust**

118.   The Unsecured Creditors' Committee and the FCR have, pursuant to section 7.2.2 of the Modified Plan, nominated the following individuals to serve as Trustees of the Asbestos PI Trust:  Hon. Ken M. Kawaichi (retired), Ellen S. Pryor, and Larry T. Tersigni.

**Objections to Confirmation**

119.    The Scheduling Order fixed September 12, 2005 as the deadline for filing objections to the Modified Plan. Several objections to confirmation were filed by insurers of the Debtor, the United States Trustee, and other arguably interested parties. However, by the conclusion of the confirmation hearing, all of the objections asserted by insurers had been withdrawn and all of the other objections had been resolved on a consensual basis and/or otherwise withdrawn. As a consequence of the foregoing, there are no objections to the confirmation pending. Thus, this Court is not required to address, and does not address herein, whether insurers have standing to raise such objections.

## CONCLUSIONS OF LAW

### Compliance of the Modified Plan and the Disclosure Statement With
### Requirements for Confirmation under Section 1129 of the Bankruptcy Code

### Section 1129(a)(1) – Plan Compliance with the Provisions of the Bankruptcy Code

120.    The Modified Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

121.    As required by section 1122(a) of the Bankruptcy Code, Article 3 of the Modified Plan classifies each Claim against and Equity Interest in the Debtor into a class containing only substantially similar Claims or Equity Interests. A reasonable basis exists for the classification scheme employed by the Modified Plan, and the Debtor's classification of Claims and Equity Interests is fair and reasonable.

122.    Pursuant to section 1123(a)(1) of the Bankruptcy Code, Article 3 of the Modified Plan properly classifies all Claims against the Debtor, excepting Claims of a kind specified in sections 507(a)(1), 507(a)(2), or 507(a)(8) of the Bankruptcy Code.

123.    Pursuant to section 1123(a)(2) of the Bankruptcy Code, Article 3 of the Modified Plan properly identifies and describes the treatment of each class of Claims and Equity Interests that is not impaired under the Modified Plan.

124.    Pursuant to section 1123(a)(3) of the Bankruptcy Code, Article 3 of the Modified Plan properly identifies and describes the treatment of each class of Claims or Equity Interests that is impaired under the Modified Plan.

125.    Pursuant to section 1123(a)(4) of the Bankruptcy Code, the Modified Plan provides the same treatment for each Claim or Equity Interest in a particular class, unless the holder of a particular Claim or Equity Interest agrees to a less favorable treatment of such particular Claim or Equity Interest.

126.    In accordance with section 1123(a)(5) of the Bankruptcy Code, the Modified Plan provides adequate means for its execution and implementation, including, without limitation, the execution and effectuation of the ABB and Non-Debtor Affiliate Settlement Agreement and the Insurance Assignment Agreement, the creation of the Asbestos PI Trust, issuance of the Asbestos Insurance Entity Injunction and the Channeling Injunction, the Effective Date contributions and post-Effective Date corporate management, governance and actions of the Debtor and the Asbestos PI Trust in Article 7 of the Modified Plan.

127.    Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Modified Plan provides that, on or prior to the Effective Date, the Debtor shall adopt an Amended Certificate of Incorporation, which will prohibit the issuance of non-voting equity securities and provide for the appropriate distribution of voting power among all classes of equity securities authorized for issuance. In accordance with the Modified Plan, the Debtor adopted and filed such an Amended Certificate of Incorporation with the Secretary of State for the State of Delaware.

128.    In accordance with section 1123(a)(7) of the Bankruptcy Code, the provisions of the Modified Plan, the Amended Certificate of Incorporation, the Asbestos PI Trust Agreement and the TDP regarding the selection of the executive officers and directors of Reorganized Debtor, the selection of the initial Trustees of the Asbestos PI Trust, the initial members of the TAC and the FCR, are consistent with the interests of the holders of Claims and Equity Interests and with public policy, and the initial selection of each such individual is consistent with the interests of the holders of Claims and Equity Interests and with public policy.

129.    Pursuant to section 1123(b)(1) of the Bankruptcy Code, the Modified Plan impairs or leaves unimpaired, each class of Claims, secured or unsecured, or of Equity Interests.

130.    Pursuant to section 1123(b)(2) of the Bankruptcy Code, the Modified Plan provides for the assumption of any unexpired lease or executory contract that has not been rejected by the Debtor with the Court's approval on or prior to the Effective Date, except those executory contracts and unexpired leases that the Debtor designates as being subject to rejection in connection with the Effective Date.

131.    As discussed in further detail below, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Modified Plan provides for the settlement or adjustment of all claims and interests belonging to the Debtor or its Estate.  The Modified Plan resolves all disputes between and among the Debtor and the Asbestos Protected Parties.  These settlements, resolutions and releases are inextricably intertwined and constitute critical components of an appropriate settlement and compromise, consistent with Bankruptcy Rule 9019, which settlements are fair, equitable, reasonable, and in the best interests of the Debtor and its Bankruptcy Estate, Reorganized Debtor, the Asbestos PI Trust, and holders of Claims, Equity Interests and Demands (including holders of Asbestos PI Trust Claims and Demands and Participating Claims).

132.    In accordance with section 1123(b)(6) of the Bankruptcy Code, the Modified Plan

includes other appropriate provisions not inconsistent with the Bankruptcy Code, including,

without limitation:

- The Debtor will possess Cash necessary to satisfy Allowed Administrative Expense
  Claims on the Effective Date, or as otherwise required by the Modified Plan;

- The Debtor will possess Cash necessary to satisfy Allowed Claims in Classes 1, 2, 3 and
  4 on the Effective Date;

- The Debtor will possess Cash necessary to cure any existing defaults relating to all
  executory contracts and unexpired leases assumed pursuant to the terms of the Modified
  Plan; and

- The Modified Plan consists of and incorporates a series of agreements negotiated among
  the Debtor and other entities, including, but not limited to, the ABB and Non-Debtor
  Affiliate Settlement Agreement, and the CE Settlement Trust Settlement Agreement to
  ensure the success and the feasibility of the Modified Plan.

**Section 1129(a)(2) – Debtor Compliance with the Provisions of the Bankruptcy Code**

133.    The Debtor has complied with all applicable provisions of the Bankruptcy Code,

as required by section 1129(a)(2) of the Bankruptcy Code.

134.    Specifically, in connection with the solicitation of votes on the Modified Plan, the

Debtor disclosed to the holders of impaired claims adequate information as required by section

1125(a) of the Bankruptcy Code.

135.    Moreover, the Debtor, its respective agents, directors, officers, employees, and

professionals, and any other Entities that solicited acceptances of the Modified Plan have acted

in good faith within the meaning of section 1125(e) of the Bankruptcy Code and are entitled to

the protections afforded thereby.

**Section 1129(a)(3) – Proposal of the Modified Plan is in Good Faith**

1.    The totality of the circumstances surrounding the formulation and proposal of the

Modified Plan, including, but not limited to, the uncontroverted affidavits presented at the

Confirmation Hearing, which demonstrate that the Modified Plan is the result of extensive arms-

length negotiations between and among the Debtor, the Unsecured Creditors' Committee, the Future Claimants Representative and others, demonstrates that the Modified Plan was proposed in good faith and not by any means forbidden by law.

2.   As evidenced by the overwhelming acceptance of the Modified Plan, the Modified Plan achieves the goal of consensual reorganization embodied by the Bankruptcy Code.  Further, as described in greater detail below, the Modified Plan's indemnification, exculpation, release and injunction provisions have been negotiated in good faith, are consistent with sections 105, 524, 1129 and 1142 of the Bankruptcy Code, and are necessary to the Debtor's successful reorganizations.

3.   The Debtor, Reorganized Debtor, ABB, the Unsecured Creditors' Committee and the Future Claimants' Representative and their respective Affiliates, officers, directors, stockholders, members, representatives, attorneys, accountants, financial advisors and agents have reasonably relied on the opinions of counsel, accountants, and other experts or professionals employed by the same in formulating the Modified Plan, soliciting votes in support thereof and otherwise managing the Debtor's Chapter 11 Case.  Such reliance conclusively establishes good faith and the absence of willful misconduct.

4.   The Modified Plan was proposed with the legitimate and honest purpose of reorganizing the business affairs of the Debtor and maximizing returns to creditors of the Debtor. The terms and conditions of the Modified Plan Documents are fair, equitable, reasonable, non-collusive, and in the best interests of the Debtor's creditors and its Bankruptcy Estate.

**Section 1129(a)(4) – Approval of Certain Payments as Reasonable.**

5.   All payments by the Debtor for costs and services to the estate in connection with the Debtor's Chapter 11 Case, or in connection with the Modified Plan and incident to the Chapter 11 Case, to representatives, consultants, professionals and others, the approval of which is

required under the Bankruptcy Code, either have previously been approved by the Court or

remain subject to approval by the Court as reasonable, and were adequately disclosed in the

Modified Plan and the Disclosure Statement and exhibits thereto or have been disclosed prior to

or at the Confirmation Hearing.

**Section 1129(a)(5) – Disclosure of Identity and Affiliations of Proposed
Reorganized Debtor's Management, Proposed TAC Members and
Trustees and Proposed Compensation of Insiders is Consistent with
The Interests of Creditors and Equity Interests and Public Policy**

6.   The Debtor has duly and properly disclosed the identity and affiliations of the

proposed directors and officers of the Reorganized Debtor, TAC members, the Trustees, and the

FCR, and the identity and compensation of insiders who will be employed by the Reorganized

Debtor or the Asbestos PI Trust.  The appointment or continuance of the proposed directors,

officers, TAC members, Trustees and FCR is consistent with the interests of the Creditors and

Equity Interests and with public policy.

**Section 1129(a)(6) – Approval of Rate Changes**

7.  The Debtor's current business does not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after confirmation of the Modified Plan.

**Section 1129(a)(7) – Best Interests of Holders of Claims and Equity Interests**

8.  The liquidation analysis introduced at the Confirmation Hearing, which concludes that holders of impaired claims against the Debtor who did not accept the Modified Plan would receive in a chapter 7 liquidation less than the value that will be realized by the holders of such Claims and Equity Interests under the Modified Plan, is reasonable and is supported by the evidence in the record.

**Section 1129(a)(8) – Acceptance of the Modified Plan by Each Class Entitled to Vote for the Plan**

9.  With respect to each impaired class of Claims, Creditors that hold at least two-thirds in amount and more than one-half in number of the Allowed Claims of such class have accepted the Modified Plan.

10.  Furthermore, more than seventy-five percent (75%) of the creditors in each of Class 5 (Asbestos PI Trust Claims) and Class 6 (Participating Claims) have accepted the Modified Plan, thereby satisfying the requirements of section 524(g) of the Bankruptcy Code.

11.  Classes 1, 2, 3 and 4 under the Modified Plan are unimpaired and are deemed to have accepted the Modified Plan.

**Section 1129(a)(9) – Treatment of Priority Claims**

12. The Modified Plan provides for the treatment of Administrative Expense Claims, Priority Tax Claims and Claims entitled to priority pursuant to sections 507(a)(3) – (8) of the Bankruptcy Code in the manner required by section 1129(a)(9) of the Bankruptcy Code.

**Section 1129(a)(10) – Acceptance of the Modified Plan by Each Impaired Class**

13. The Modified Plan has been accepted by all classes of impaired Claims that are entitled to vote, including classes 5 and 6, as determined without including any acceptance of the Modified Plan by any insider.

**Section 1129(a)(11) – Feasibility of the Modified Plan**

14. Confirmation of the Modified Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized Debtor or the Asbestos PI Trust. Conditioning the Effective Date of the Modified Plan upon the effective date of the Lummus Plan does not render the Modified Plan unfeasible.

**Section 1129(a)(12) – Payment of Bankruptcy Fees**

15. All fees payable under 28 U.S.C. § 1930, if any, have been paid or will be paid on the Effective Date. The Debtor will possess Cash necessary to pay any fees payable under 28 U.S.C. § 1930, as determined by the Court at the Confirmation Hearing.

**Section 1129(a)(13) – Retiree Benefits**

16. The Debtor has no obligation to pay retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code.

**Section 1129(d) – Principal Purpose Not Tax Avoidance**

17. No party in interest, including, without limitation, any governmental unit or taxing authority, has requested the Court to deny confirmation of the Modified Plan or grounds that the principal purpose of the Modified Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 and the primary purpose of the Modified Plan is not such avoidance. Accordingly, the Modified Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**The Asbestos PI Trust and the Channeling Injunction Comply
With the Requirements of Section 524(g) of the Bankruptcy Code**

**Section 524(g)(1) - The Channeling Injunction Provided for in the Modified Plan
Complies with the Notice and Hearing Requirements and Is Otherwise Proper**

18. In accordance with section 524(g)(1) of the Bankruptcy Code, the Modified Plan provides that the Channeling Injunction will be issued in connection with the Order confirming the Modified Plan.

19. There has been proper notice of the Confirmation Hearing, and the terms of the Channeling Injunction properly enjoin Entities from taking legal action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery with respect to any Claim or demand that, under the Modified Plan, is to be paid in whole or in part by the Asbestos PI Trust, except as otherwise expressly allowed by the terms of such Injunctions, the Confirmation Order and the Modified Plan, respectively.

**Section 524(g)(2) - The Asbestos PI Trust Satisfies
the Structural Requirements of Section 524(g)**

20. As of the Petition Date, in accordance with section 524(g)(2)(B)(i)(I), the Debtor had been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

21. In accordance with the section 524(g)(2)(B)(i)(I)-(IV) of the Bankruptcy Code, the Channeling Injunction is to be implemented in connection with the Asbestos PI Trust which, pursuant to the Modified Plan:

- shall assume the liabilities of the Debtor with respect to Asbestos PI Trust Claims;

- is to be funded in part by the securities of the Debtor and by the obligations of such Debtor to make future payments;

- on the Effective Date will have rights to convert certain rights under the Modified Plan into ownership of the majority of the voting shares of the Reorganized Debtor; and

- is to use its assets and income to pay Asbestos PI Trust Claims, Certified Unpaid Settlement Trust Claims, Non-Qualified Claims and Subsequent Malignancy Claims.

22. As required by section 524(g)(2)(B)(ii)(I)-(V), the facts and circumstances of

Debtor's Chapter 11 Case include the following:

- the Debtor is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events to those that gave rise to the Asbestos Claims which are addressed by the Channeling Injunction and the Asbestos Insurance Entity Injunction;

- the actual amounts, numbers, and timing of Demands cannot be determined;

- the pursuit of Demands outside the procedures prescribed by the Modified Plan and the TDP is likely to threaten the Modified Plan's purpose to deal equitably with Asbestos PI Trust Claims and Participating Claims;

- the terms of the Channeling Injunction and the Asbestos Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in the Modified Plan and described in the Disclosure Statement;

- the Modified Plan establishes, in Class 5, a separate class of claimants whose Claims are to be addressed by the Asbestos PI Trust;

- each class of claimants whose Claims are to be addressed by the Asbestos PI Trust has voted, by more than seventy-five percent (75%) of those voting, in favor of the Modified Plan; and

- pursuant to the TDP, the Asbestos PI Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos PI Trust Claims, Certified Unpaid Settlement Trust Claims, Non-Qualified Claims and Subsequent Malignancy Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos PI Trust shall value, and be in a financial position to pay, Asbestos PI Trust Claims, Certified Unpaid Settlement Claims, Non-Qualified Claims and Subsequent Malignancy Claims that involve similar Asbestos PI Trust Claims in substantially the same manner.

23. The Asbestos PI Trust will be funded with a sufficient and reliable pool of assets.

Among other things, the Debtor will continue to operate as a going concern subsequent to the

Effective Date and the Asbestos PI Trust will have the ability to acquire an 95% interest in the

Debtor that will be worth at least $20 million following the completion of environmental remediation efforts.

## Section 524(g)(4) - The Channeling Injunction Shall Be Valid And Enforceable Pursuant to Section 524(g)(4) of the Bankruptcy Code

24. In accordance with section 524(g)(4)(A), the Channeling Injunction shall be valid and enforceable against all entities that it addresses since the Asbestos Protected Parties, the CE Settlement Trust Protected Parties and the Settling Asbestos Insurance Companies are all appropriate third parties eligible for protection pursuant to section 524(g)(4)(A)(ii) of the Bankruptcy Code.

25. In accordance with section 524(g)(4)(B)(i) of the Bankruptcy Code, the Future Claimants' Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that would constitute Asbestos PI Trust Claims and are transferred to the Asbestos PI Trust pursuant to the Channeling Injunction.

26. The Future Claimants' Representative supports the Modified Plan and approves of the treatment provided to holders of Asbestos PI Trust Claims, including, but not limited to, the issuance of the Channeling Injunction.

27. In accordance with section 524(g)(4)(B)(ii) of the Bankruptcy Code, in light of the benefits provided, or to be provided, to the Asbestos PI Trust by or on behalf of each Asbestos Protected Party, CE Settlement Trust Protected Party and Settling Asbestos Insurance Company, the Channeling Injunction is fair and equitable with respect to persons that might subsequently assert Demands that would constitute Asbestos PI Trust Claims against any Asbestos Protected Party, CE Settlement Trust Protected Party and Settling Asbestos Insurance Company.

28. The Modified Plan otherwise complies with section 524(g) of the Bankruptcy Code.

## Approval of the Settlements, Discharges, Releases
## And Injunctions Provided Under the Modified Plan

29. The Court has the power and authority under sections 524(g) and 105(a) of the Bankruptcy Code to enter the injunctions contemplated by the Modified Plan which, among other things, will channel the Asbestos PI Trust Claims, Non-Qualified Claims, and Certified Unpaid Settlement Trust Claims to the Asbestos PI Trust and limit the direct or indirect prosecution of Asbestos Claims against the Debtor, any or all of the Asbestos Protected Parties, the CE Settlement Trust Protected Parties and Settling Asbestos Insurance Companies and prohibit any Entity from attempting to circumvent the Modified Plan and the orders of the Court.

30. The Asbestos Insurance Entity Injunction is a proper exercise of the foregoing authority of the Court and its entry is warranted by the facts and circumstances of this case.

31. Pursuant to sections 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a), and in consideration of the classification, distributions, and other benefits provided under the Modified Plan, the provisions of the Modified Plan constitute a good faith compromise and settlement of all the Claims and controversies resolved pursuant to the Modified Plan.

32. Based upon the representations and arguments of counsel to the Debtor, ABB Holdings, ABB, the FCR and the Unsecured Creditors' Committee, as applicable, and all other testimony either actually given or proffered and other evidence introduced at the Confirmation Hearing and the full record of this Chapter 11 Case, such settlements, compromises, and the Channeling Injunction and the Asbestos Insurance Entity Injunction:

- Reflect a reasonable balance between certainty and the risks and expenses of both future litigation and the continuation or conversion of this Chapter 11 Case;

- Fall well within the range of reasonableness for the resolution of complex litigation;

- Are fair and equitable and in the best interest of the Debtor, its estate, Creditors and other parties in interest;

- Will maximize the value of the Bankruptcy Estate by preserving and protecting the ability of CE to continue operating outside of bankruptcy protection and in the ordinary course of business; and

- Are essential to the successful reorganization of the Debtor.

33. Further, each non-debtor entity that will benefit from the releases, waivers of claims, exculpations, indemnities and injunctions contained in the Modified Plan either shares an identity of interest with the Debtor, was instrumental to the successful prosecution of the Chapter 11 Case, provided necessary funding to the Debtor and/or has contributed substantial assets or other benefits to the Debtor's reorganization, which value will allow for distributions that would not otherwise be available but for the contribution made by such non-Debtor parties. Such releases, waivers, exculpations, indemnities and injunctions are essential to the Debtor's successful reorganization and each of the impacted classes has voted overwhelmingly to accept its proposed treatment under the Modified Plan and are consistent with applicable laws.

34. All releases, discharges, and injunctions with respect to claims and causes of action against the Asbestos Protected Parties, the CE Settlement Trust Protected Parties and Settling Asbestos Insurance Companies set forth in the Modified Plan are inextricably intertwined, are an integral part of the Modified Plan, are fair, equitable, reasonable, and in the best interests of the Debtor and its Bankruptcy Estate, Reorganized Debtor, the Asbestos PI Trust, and holders of Claims, Equity Interests and Demands (including holders of Asbestos PI Trust Claims and Demands) and are effective and binding on all Entities who may have had standing to assert such Claims or causes of action.

**Bankruptcy Rule 3016(b)**

35. The Modified Plan is dated and identifies the name of the submitting entity, in accordance with Bankruptcy Rule 3016(b).

**No Successor Liability; Vesting of Assets; Discharge of Liabilities**

36. Neither the Asbestos Protected Parties, the CE Settlement Trust Protected Parties, the Reorganized Debtor, nor the Asbestos PI Trust is, or shall be, a successor to the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtor and the Asbestos PI Trust shall assume the obligations specified in this Modified Plan and this Order.

37. Except as otherwise provided in the Modified Plan, on the Effective Date, title to all of the Debtor's assets and properties and interests in property, other than the CE Contribution, shall vest in the Reorganized Debtor, free and clear of all Claims, Equity Interests, Encumbrances and other interests, and this Order shall be a judicial determination of the discharge of the liabilities of the Debtor.

38. On the Effective Date title to the CE Contribution shall vest in the Asbestos PI Trust free and clear of all Claims, Equity Interests, Encumbrances and other interests.

**Conditions to the Effective Date**

39. The Debtor has stated that it has no reason to believe that all conditions to the Effective Date will not be satisfied or duly waived in accordance with Section 7.11 of the Modified Plan, and no party presented any evidence suggesting otherwise.

**General**

40. Due notice of the Confirmation Hearing has been given to all parties in interest.

41. The declarations and affidavits presented by the Debtor at the Confirmation Hearing provided an adequate and competent basis for the facts and opinions contained therein, and were credible.

42. Each of the conditions precedent to the entry of the Confirmation Order, as set forth in Article 7.10 of the Modified Plan, has been satisfied or waived.

**Exemptions from Securities Laws**

43. Pursuant to section 1125(d) of the Bankruptcy Code, the Debtor's transmittal of Plan Solicitation Packages, its solicitation of acceptances of the Modified Plan and the issuance and distribution of any securities pursuant to the Modified Plan, and Reorganized Debtor's participation in such activities, are not and will not be governed by or subject to any otherwise applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan of reorganization or the offer, issuance, sale, or purchase of securities.

44. Pursuant to section 1145(a)(1) of the Bankruptcy Code, the offering, issuance and distribution pursuant to the Modified Plan of Reorganized Debtor of any distributions that may be deemed to be securities shall be exempt from section 5 of the Securities Act of 1933, as amended, and from any state or local law requiring registration, notification, qualification or exemption prior to the offering, issuance, distribution, or sale of securities.

**Exemptions from Taxation**

45. Pursuant to Section 1146(c), the issuance, transfer or exchange of any security contemplated by the Modified Plan, or the making or delivery of an instrument of transfer under the Modified Plan, may not be taxed under any law imposing a stamp tax or similar tax.

It is SO ORDERED, ADJUDGED AND DECREED in Pittsburgh, Pennsylvania on December 19 ~~October~~ ___, 2005.

_Judith K. Fitzgerald_ reb

United States Bankruptcy Court Judge